UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SJ MEDCONNECT, INC., dba THALAMUS, <br><br> Plaintiff, <br><br> v. <br><br> LIAISON INTERNATIONAL, INC. and MAYA HAMMOUD. <br><br> Defendants. | **Civil Case No. 26-cv-13412** <br><br> COMPLAINT |

Plaintiff SJ Medconnect, Inc. dba Thalamus ("Thalamus") alleges on personal knowledge as to matters relating to itself, and on information and belief as to all other matters, as follows:

## INTRODUCTION

Liaison, Inc. and Maya Hammoud are engaged in a coordinated effort to unfairly compete in the residency application market through anticompetitive means including false advertising, the exploitation of Thalamus's confidential information gained by inducing non-profit organizations within the graduate medical education ("GME") space to breach an information-sharing agreement with Thalamus, predatory pricing, and revenue sharing incentives they have attempted to hide from the broader community. Thalamus has been left with no choice but to act to address the harm to its own business and the threatened harms to the broader GME community. It therefore brings claims for tortious interference, breach of contract, Lanham Act violations, and violations under M.G.L. c. 93A, § 11.

## THE PARTIES

1. Thalamus is a corporation organized under the laws of the State of Delaware, with its principal place of business in Santa Clara, California. Thalamus's primary business is providing software to medical residency and fellowship programs to help those programs and their applicants navigate and coordinate the residency and fellowship application and interview processes.

1

2.    Defendant Liaison International, Inc. ("Liaison") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Watertown, Massachusetts.

3.    Defendant Maya Hammoud ("Hammoud") is an individual residing in Ann Arbor, Michigan.

## JURISDICTION

4.    This action arises under the Lanham Act, 15 U.S.C. §§ 1051–1127. Therefore, jurisdiction over the subject matter herein is vested in this Court under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), 1338(b). Supplemental jurisdiction over the state law claims is appropriate under 28 U.S.C. § 1367.

5.    This Court has general personal jurisdiction over Liaison because its principal place of business is in the Commonwealth of Massachusetts. This Court has specific personal jurisdiction over Hammoud because Thalamus's claims arise out of and relate to Hammoud's purposeful, Massachusetts-directed conduct. Hammoud acted in concert with Liaison to develop and promote ResidencyCAS, the product at the center of this action. As alleged herein, Hammoud (i) colluded with Liaison to induce the breach of the restrictions protecting Thalamus's confidential and proprietary information and to misappropriate that information; (ii) participated in developing the competing ResidencyCAS product with, and through, the Massachusetts-based Liaison enterprise using Thalamus's confidential and proprietary information, including the provision of Thalamus's confidential and proprietary information to Liaison in Massachusetts; (iii) directed and lent her influence to the false and misleading advertising campaign carried out with and through Liaison; and (iv) personally directed false and deceptive advertisements and communications to the following residency programs located within Massachusetts: Tufts Medical Center; Boston University Medical Center; UMass Chan – Baystate; UMass Chan Medical School; Beth Israel Deaconess Medical Center; Mass General Brigham/Brigham & Women's Hospital/Massachusetts General Hospital; and Lahey Clinic. Because Thalamus's injuries arise directly out of this Massachusetts-directed conduct, the exercise of personal jurisdiction over Hammoud satisfies the

Massachusetts long-arm statute, M.G.L. c. 223A, § 3, and comports with constitutional due process.

**VENUE**

6.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Thalamus's claims occurred in this District, including Liaison's development of ResidencyCAS and the dissemination of many of the false and misleading statements alleged herein.

**FACTS**

7.    The graduate medical education ("GME") space currently sits on the precipice of a private equity-backed takeover by Liaison, a technology company with no prior experience or track record in the GME space that has attempted to penetrate GME with a hastily launched, unfinished, and unproven application platform called "ResidencyCAS," which it has developed with misappropriated technology and marketed with false and misleading statements.  Hammoud has been at the center of Liaison's orchestrated scheme, lending her credibility and peddling her influence to induce, co-opt, entice, and, in some instances deceive, key non-profit organizations, including the American Medical Association ("AMA"), the Association of Professors of Gynecology and Obstetrics ("APGO"), and the American College of Obstetricians & Gynecologists ("ACOG").  These non-profit organizations might otherwise have been expected to defend a fair and competitive market in the interest of the GME community. Instead, they have been induced—through undisclosed revenue-sharing arrangements, false and misleading statements, and the outsized personal influence of a few well-placed individuals—to lend their institutional credibility to replacing their specialties' residency application process with that of a private-equity backed company, without full transparency to their broader membership.

8.    Hammoud was personal friends with the CEO of Liaison, George Haddad, prior to working together with Liaison on ResidencyCAS. Upon information and belief, Hammoud also entered into agreements giving her a direct financial interest tied to Liaison's success in penetrating the GME market and persuading programs to shift to ResidencyCAS.  She was also a former

3

president of APGO and retained significant political influence within APGO and other OBGYN organizations. Hammoud used her influence within the OBGYN non-profit organizations to align them with Liaison from the outset and run cover for Liaison as it entered the market. Hammoud and Liaison worked to associate organizations such APGO and ACOG with ResidencyCAS in an effort to brand ResidencyCAS as the officially sanctioned "OBGYN application," thus concealing Liaison and ResidencyCAS's true private equity sponsorship.

9.    And Liaison intends to take over the entire market. Though Liaison and Hammoud have attempted, within the GME community, to brand ResidencyCAS's launch as increasing freedom of choice away from the ERAS application (see e.g., *Brouillette*, "Emergency Medicine Looks for an Alternative Residency Application Platform: Is This the End of the Electronic Residency Application Service (ERAS) Monopoly?" *Annals of Emergency Medicine* Volume 85, Issue 3, PA9-A11, March 2025), Liaison now admits that this is not its true intent. Rather, in a separate article recently authored by a Liaison representative ("Liaison's July 2026 Article"), Liaison reveals that it is not interested in choices within the residency application marketplace at all and contends that GME is desperately in need of Liaison to take over the market as a single centralized service for *all* residency applications across *all* specialties (article available at: https://www.ecampusnews.com/campus-leadership/2026/07/10/the-case-for-centralized-admissions-in-graduate-medical-education/).

10.    Private equity has already harmed other sectors of healthcare, and, given time to establish its position, its move into GME will be just as damaging. Liaison's private equity ethics have already had a negative impact on the community. As an example, the privacy of applicant data is considered sacrosanct to organizations within the GME community, including Thalamus. Yet soon after starting work for Liaison, a former residency program coordinator improperly used former credentials (inadvertently left active by her former program) to access Thalamus secured and password-protected systems to view and download applicant data. Taking advantage of this ongoing access, the Liaison employee entered the system, viewed data related to several applicants, downloaded data related to at least one specific applicant, and exited again with

additional information about applicant data *and* the internal workings of Thalamus's systems. To Liaison, the applicants' data privacy was simply a necessary casualty of its efforts to garner additional intelligence on Thalamus. Values and practices universal to GME could simply be ignored.  Thalamus was quickly alerted to Liaison's unauthorized incursions into its systems. It blocked further access by immediately contacting the residency program for which the Liaison employee previously worked to inform them the account was still active and then took remedial measures, including direct outreach to Liaison, to prevent the misuse of applicant data. But Liaison's willingness to compromise applicant privacy just to gather information about its competitors had been exposed.

11.    Liaison, with the assistance of Hammoud, built ResidencyCAS on misappropriated technology taken from Thalamus in violation of contractual obligations.  Thalamus had invested years of development and tens of millions of dollars creating the leading residency and fellowship interview management software solution within GME. As part of its own pilot-project grant funded by the AMA, Thalamus previously agreed to share its confidential technology and insights with the AMA and APGO, including with Hammoud, who was grant leader for the project. The information Thalamus shared included proprietary and economically valuable methodologies, processes, impressions, patterns, plans, compilations, formulas, designs, methods, techniques, procedures, and programs, for the design and improvement of residency application and interview management software with the AMA and APGO. But given the valuable and confidential nature of Thalamus's technology, Thalamus agreed to share information and materials only under strict contractual conditions to prevent its misuse.  These conditions included that no AMA or APGO personnel that had access to Thalamus's confidential or proprietary information, most notably Hammoud, could be involved in the development of any competing product. (The "Aggregate Pilot Data" collected from programs under the Agreement, any information on Thalamus's services, features, or functionality, and any other Thalamus confidential and proprietary information, all together constitute Thalamus's "Restricted Information" under the Agreement).

12.    Liaison and Hammoud colluded to induce the AMA and APGO to breach their contract with Thalamus.   They also colluded to develop ResidencyCAS using Thalamus's confidential and proprietary Restricted Information. ResidencyCAS was rushed to market as a first-generation platform with no established operational track record in either GME or other markets, after which the defendants promoted it through false and misleading marketing and exclusion of Liaison's potential competitors from sales and marketing opportunities controlled by organizations including the AMA, APGO, and ACOG. Together, Liaison and Hammoud ran a coordinated campaign to secure the OBGYN market, including making false and misleading comparisons to Thalamus and false and misleading assertions of universal adoption to OBGYN residency programs. These representations were intended to pressure remaining residency programs into believing they must adopt ResidencyCAS or risk losing applicants for the next residency cycle and diminishing the influence and standing of their program leadership within the specialty. In some instances, such assertions were made explicitly.

13.    Using this strategy of false and misleading statements, Liaison was able to capture nearly the entire residency application and interview management market for the Obstetrics & Gynecology specialty ("OBGYN") in just over a year, and without an active or operational product for most of that time, displacing the long-established and industry leading Electronic Residency Application Service ("ERAS") developed by the non-profit Association of American Medical Colleges ("AAMC"). Liaison, assisted by Hammoud and her influence and leadership roles within key non-profit organizations, including the AMA, APGO, and ACOG, accomplished this rapid market shift through an orchestrated campaign of false statements and subtle intimidation of the OBGYN residency program directors and coordinators. OBGYN programs were falsely told, repeatedly, that *all* OBGYN programs would use (or, in some cases, told that all programs were already using) ResidencyCAS, creating the impression that program leaders had little practical choice but to adopt ResidencyCAS or risk competitive disadvantage. Although organizations such as the AMA, APGO, and ACOG, cannot mandate decisions by individual residency programs regarding use of application software, they are widely regarded as trusted and authoritative voices

within the OBGYN specialty and broader medical education community. Hammoud and Liaison leveraged this authority to coerce programs to switch to ResidencyCAS. Rarely, if ever, was using ResidencyCAS presented to programs as the *choice* it was. Programs have privately expressed frustration to Thalamus personnel that they felt forced to switch to ResidencyCAS against their will.

14. The problem was not isolated to the OBGYN specialty. A representative of organizational leadership within the Emergency Medicine specialty ("Emergency Medicine"), speaking frankly at a presentation designed to sell ResidencyCAS to Emergency Medicine programs, explicitly acknowledged that OBGYN leadership "didn't give [programs] a choice" in moving to ResidencyCAS. Even where programs have not felt forced to switch, they have been convinced by false promises of non-existent ResidencyCAS functionality—often with explicit, and false, comparisons to Thalamus's own offerings.

15. Program leaders have complained that Liaison and its partners had promised ResidencyCAS would be smoother and more customizable than ERAS/Thalamus, but that its application review system was clunky, difficult to use, and did not have the same customization options available in ERAS/Thalamus. Upon information and belief, one such complaint was publicly voiced by a program leader in a November 18, 2024, Council on Resident Education in Obstetrics and Gynecology ("CREOG") Zoom meeting on ResidencyCAS (the "November 2024 CREOG Zoom"). CREOG is a subcommittee council of ACOG.

16. Program leaders also noted to Thalamus that defendants had promised them a single-platform, all-in-one system that was even more streamlined than Thalamus', but instead, ResidencyCAS uses multiple portals and requires significantly more complexity than Thalamus to accomplish the same tasks.

17. Liaison has made clear that its unfair practices will not be limited to the OBGYN market. Liaison has since expanded into other specialties as well, using the same false and misleading and unfair practices. On information and belief, Liaison intends to implement this strategy for the residency application and interview process across all GME. After finding success

7

using this playbook with OBGYN, Liaison then worked with the Council of Residency Directors in Emergency Medicine ("CORD-EM") to implement a similar game plan of false promises and coerced adoption for the Emergency Medicine specialty. Further, Liaison is using Hammoud and other OBGYN GME leaders as emissaries, falsely presenting OBGYN's experience as a model for success while minimizing or omitting the significant dissatisfaction expressed by many residency programs that previously adopted ResidencyCAS. An article published in the "Annals of Emergency Medicine," touting ResidencyCAS to an audience including Emergency Medicine program leaders, is organized largely around input from Hammoud, who it describes as having worked on the development of ResidencyCAS. (Article can be accessed at: https://www.annemergmed.com/article/S0196-0644(24)01299-X/fulltext.)

18. Liaison has already begun marketing to other specialties for future years and is engaged in artificially low, predatory pricing. However, applicants do not get a say in which residency application software a program or specialty uses and will not be able to escape the price increases sure to come once ResidencyCAS reaches the point in its life cycle where Liaison is no longer willing to subsidize losses or otherwise sees reason to increase prices. Conversely, Thalamus is a Public Benefit Corporation, guided by the following mission in its certificate of incorporation (its foundational corporate governance document): "ensuring greater access to affordable, high-quality medical education and training, addressing systemic inequities in the physician workforce, and delivering better healthcare outcomes for patients and society." As such, Thalamus has operated on a business model where all costs are paid for by programs and institutions (*i.e.*, all services for applicants are complimentary).

19. Hammoud and her institutional backers are not acting solely out of a good-faith effort to improve the transition to residency. Rather, Liaison has offered participating organizations a share of the applicant fees generated by ResidencyCAS, creating a direct financial incentive to promote and expand adoption of the platform into OBGYN, Emergency Medicine, and other specialties considering a switch to Liaison. Yet the financial interests underlying these recommendations, and the resulting conflicts of interest in accepting payment to hand over control

of their specialty's GME application process and transition to residency to a private-equity backed company, have not been fully disclosed to the broader medical education community or the general public.

20.    Thalamus is informed and believes that at the November 2024 CREOG Zoom meeting, numerous program leaders expressed frustration with dishonesty from OBGYN leadership. These frustrated program leaders have specifically noted that claims of 100% adoption and "buy-in" from OBGYN programs were based on coerced adoption, false and misleading claims from specialty leaders that other programs had all agreed to use ResidencyCAS, and threats to hold-outs that they would be the only program using another application service and would thus miss out on applicants who did not want to complete separate OBGYN applications on two distinct software platforms.

21.    While cost-shifting, predatory pricing, and targeted revenue sharing can temporarily induce residency programs and trade groups to support this private-equity backed takeover, these benefits will not last once Liaison has eliminated the competition. Applicant costs will continue to rise, and program costs may even be introduced, or revenue sharing phased out.

22.    APGO and other organizations within the medical education community appear not to fully appreciate the economic incentives that accompany private equity ownership. Private equity-backed companies are ultimately accountable only to their investors and are expected to maximize enterprise value. Though defendants initially worked to brand ResidencyCAS as increasing competition in the application space, Liaison's July 2026 Article revealed that this was just temporary cover and that Liaison's ultimate goal was consolidation of the residency application market under Liaison's for-profit banner. If this path continues, applicants will bear the immediate costs of a single, for-profit, entity setting prices without the constraints of competition. Residency programs likewise will face diminished choice, innovation, and competitive discipline over time, while Liaison and its investors stand to benefit from the resulting market concentration. Further, if Liaison succeeds in consolidating control over the residency

application process, it will possess both the incentive and the opportunity to expand its commercial influence into adjacent aspects of the residency selection ecosystem.

23. The next logical step for Liaison's profit consolidation strategy would be to seek further influence over, or even eventual for-profit privatization of, the National Residency Matching Program ("NRMP"). It would be unrealistic to expect the NRMP to keep control of the matching process under its non-profit umbrella when the remainder of the residency application system rapidly shifts from the non-profit AAMC to Liaison's private-equity backed approach. And even as the NRMP remains a non-profit, Liaison is already exerting substantial influence not previously seen in this space. First, ResidencyCAS and the NRMP were integrated through a backend data exchange during ResidencyCAS's first year of operation, before comparable functionality was made available to the widely used ERAS platform and despite no such integration ever being made available to Thalamus. Second, the NRMP's Chief Executive Officer was the only prominent leader in graduate medical education publicly identified as serving on the ResidencyCAS Advisory Board. Third, Hammoud has repeatedly highlighted and promoted the relationship between ResidencyCAS and the NRMP in personal relationships, conference presentations and other public forums.

24. Those in the GME space need not look far to find examples of similar private takeovers of industries formerly run primarily by non-profits. Changes to the hospital industry demonstrate what can happen when for-profit companies and private equity take over a formerly non-profit driven space.

25. On August 19, 2024, during the period in which defendants were promoting ResidencyCAS throughout the OBGYN community, *STAT News* published an article entitled *"Private Equity: Health Care's Vampire"* by Steffie Woolhandler, David U. Himmelstein, Elizabeth Schrier, and Hope Schwartz. The article discussed the broader impact of private equity ownership in health care, describing evidence that private equity acquisitions have been associated with higher costs and poorer patient outcomes in certain health care settings. While Hammoud and Liaison were urging OBGYN residency programs to transition to ResidencyCAS, the article

10

highlighted the importance of carefully considering the incentives created by private equity ownership in health care and medical education. The article is available at: https://www.statnews.com/2024/08/19/private-equity-health-cares-vampire/

**The "Match" Process and the Role of Thalamus's Software**

26. The United States is widely recognized for its physician training system, which has long been regarded as among the finest in the world. At the center of that system is GME, including the residency selection and training process. To become licensed physicians and obtain specialty board certification (such as Internal Medicine or Anesthesiology), medical school graduates must complete years of supervised clinical training in accredited residency programs. During residency, physicians progressively assume greater clinical responsibility under the supervision of experienced attending physicians, before ultimately practicing independently. The integrity, fairness, and effective administration of the residency application, selection, and training process are therefore matters of substantial public importance, directly affecting the quality of the nation's physician workforce and, ultimately, patient care.

27. Equally important is ensuring that residents and residency programs are appropriately matched. Residency is an intensive, years-long period of training during which residents' professional development, well-being, and future careers are shaped by the programs in which they train. Poor alignment can have profound consequences for both the resident and the training program, potentially limiting professional development, contributing to burnout, and impacting patient care. The very name of the Hammoud-led, AMA-funded initiative under which APGO and ACOG are working with Liaison is entitled "Right Resident, Right Program, Ready Day One," ("RRR" or the "RRR Project") underscoring that these organizations recognize the importance of preserving a residency selection process that places educational outcomes above commercial interests.

28. Because of the importance of matching each resident with the right training program, continued innovation within GME is essential. Concentration of control over the residency application process in the hands of a single private equity-backed company threatens to

diminish competitive innovation and shift priorities away from educational outcomes and toward financial returns. These risks are particularly significant for applicants from historically disadvantaged backgrounds, including, as one example, applicants from rural and underserved communities.

29.     Similarly, if the application process becomes more expensive for applicants, it disadvantages medical students from lower-income backgrounds. To that end, the AAMC has innovated in recent years to develop processes to help candidates successfully match while applying to fewer programs and offers fee assistance programs that grant the average recipient over $500 off their total residency application costs. This not only reduces application costs for applicants but also reduces burdens during the interview process (*e.g.*, travel costs where programs are doing in-person interviews). Unlike the AAMC, whose nonprofit mission includes reducing barriers to residency, Liaison has currently pursued below-cost pricing only to gain market share. Once that predatory pricing strategy succeeds in reducing competition, and Liaison achieves the monopolistic goals set forth in Liaison's July 2026 Article, the economic incentive shifts from market expansion to revenue maximization.

30.     Currently, "The Match" is an annual program, run by the NRMP, in which medical students in their final year are matched with programs around the country where they will complete their residency training.

31.     The Match utilizes an algorithm developed by the NRMP to match each residency applicant with a program based on rank order lists created by each of the applicants and residency programs.

32.     Each residency applicant submits a list of the residency programs to which they applied and interviewed, ranked in order of preference. Each residency program similarly submits a list of all their applicants that interviewed in order of preference. These lists are then inputted to the NRMP, which—with limited exceptions not relevant here—matches each applicant to a program best fitting the mutual desires of the program and the applicants through a mathematical algorithm.

33.     To create their rank order lists, residency programs rely on form applications submitted by each applicant. For many years, the main residency application was ERAS, an application developed and provided by the AAMC, a non-profit organization.

34.     In addition to reviewing the applications, transcripts, and other information, programs also conduct interviews with residency applicants when determining how to rank the applicants for the NRMP Match. These interviews are critical to programs because they are the one data point that goes beyond documentation, to the full person behind the application. Being selected for and completing an interview with a residency program is a requirement to be eligible to match at that program.

35.     Thalamus is a strategic collaborator with the AAMC and provides a suite of software to help streamline the residency application process, including interview scheduling, automated itinerary building, videoconferencing software for virtual interviews, and application screening and review.

36.     Thalamus Core is Thalamus's industry-leading residency interview scheduling software solution. In addition to Thalamus Core, Thalamus also offers several other add-on products, including automated itinerary building ("Itinerary Wizard"), video conferencing software ("Thalamus Video"), data and analytics platform ("Cerebellum"), and Thalamus's technology-assisted application review and screening platform ("Cortex").

37.     Thalamus Core provides patented and comprehensive interview management that allows programs to manage their entire recruitment process using Thalamus's proprietary real-time scheduling system. Thalamus Core allows applicants to self-schedule their residency interviews, confirm interview dates instantaneously, and take full control of their interview schedules.

38.     Thalamus Core integrates with ERAS and other application systems and offers an advanced scheduling dashboard and centralized calendar to allow programs to manage multiple rounds of interviews for each applicant, configure scheduling groups and tiers to get a desired candidate mix in support of recruitment goals, and receive scheduling updates. Applicants may

schedule their interviews through a web-interface or through a mobile application that applicants can download to their personal devices. It also offers waitlist management tools, interfaces to evaluate applicants, automated data reports, and an itinerary builder to build, view, and print applicant/faculty interview schedules and organize interview events by candidates, interviewer, or location. Additionally, Thalamus Core allows programs to build preliminary rank lists of applicants, which includes drag and drop reordering functionality that can then be exported and uploaded into the NRMP system.

39.     Thalamus's "Itinerary Wizard" further streamlines itinerary builder capabilities by automating the creation of faculty and applicant interview schedules. The tool allows residency programs to instantly create itineraries from customizable rules based on preferences and constraints, including pre-existing data about individual interviewer and interviewee availability, then make automated instant and manual adjustments to those itineraries based on last-minute changes to interviewer availability. The Itinerary Wizard also automatically assigns video interview links and sends custom calendar invites to eliminate opportunities for miscommunication once the itineraries are set.

40.     These links can be to Thalamus's own virtual interview platform, "Thalamus Video," which is specifically designed for use in GME, or to third-party video platforms like Zoom that integrate seamlessly with Thalamus. Thalamus Video is fully web-based, requires no installation, and allows for real-time interviewer feedback from Thalamus's built-in interview scoring and notes feature. It also provides programs with an "Admin Hub," a primary view showing all scheduled interviews, interviews currently in progress, time remaining, and a "virtual knock" reminder to users when interview time is expiring.

41.     Cortex is Thalamus's application screening and review platform, which allows residency programs to facilitate application screening by surfacing important data in snapshot or comprehensive views to streamline the review process.

42.     Cortex also allows programs to selectively screen application data to reduce conscious and unconscious bias while promoting a comprehensive and holistic screening process.

14

Cortex allows any applicant data categories to be blinded for review, including the applicant's name and photo.

43.    Cortex also presents actual application data in a user interface optimized for GME recruitment including core clerkship and exam grades, as well as educational and volunteer activities, publications, education, and more displayed in a timeline view. Cortex's data visualization tools also allow for keyword searches to provide deeper insights. Multiple view modalities also provide a comprehensive summary of, and facilitate evaluation of, all applicants. Finally, Cortex allows for exporting of data to Excel and other Thalamus products to track and manage data from the time of application through and beyond The Match.

44.    Thalamus's Cerebellum data & analytics dashboard provides comprehensive analysis and comparison data of GME program and academic institution recruitment performance from multiple perspectives to provide exploratory and deterministic insights to optimize efficient GME recruitment practices and help institutions meet recruitment goals to better align their physician workforce with patient population needs. The Cerebellum platform provides summary program statistics, geographical and other recruitment outcomes, and interview statistics including invitation and completion insights. These insights include who was invited, waitlisted, canceled, missed or withdrawn, and interviewed along with statistics regarding program interview performance, benchmarked against other program performance in the defined specialty.

45.    Thalamus has developed and continues to develop patent-pending technology to streamline and provide analytics regarding the interview process for both applicants and interviewing entities. Beyond residency matching, this technology also can and has been used by other medicine-adjacent healthcare professions (*e.g.*, pharmacy, dentistry, etc.) and graduate schools, law firms, and other interviewing entities.

46.    Thalamus has initially targeted the medical residency and fellowship interview process, where it operates as the premier cloud-based interview management platform designed specifically for application to GME training programs. For the last 13 years, over 8,000 residency and fellowship programs at over 800 academic medical centers and health systems, have adopted

15

the Thalamus platform, which has been used to schedule millions of interviews for over 550,000 residency and fellowship applicants/physicians, which is greater than 50% of the broader US physician workforce.

47.    Thalamus and the AAMC announced a strategic collaboration on April 27, 2023, to provide Thalamus Core, Itinerary Wizard, and Cerebellum, without additional cost, to all residency and fellowship programs using the ERAS application.  Cortex was also provided at no additional cost beginning July 1, 2025. Thus, any loss of market share for the ERAS application in turn harms Thalamus's own market share and overall business.

**The Pilot Project and Hammoud's Access to Confidential Thalamus Information**

48.    Thalamus previously partnered with Hammoud, APGO, and the AMA on a pilot project grant for the 2020–2021 and 2021–2022 GME residency recruitment seasons. As part of this arrangement, OBGYN programs were given complimentary access to all Thalamus products available at that time (Thalamus Core, Cortex, Thalamus Video, and Itinerary Wizard). Thalamus shared data with the AMA and APGO, for research purposes, with Hammoud as the main leader (also known as the principal investigator, or "PI") under the grant, and the organizations worked to jointly publish a paper with Thalamus based on certain portions of such data, with Hammoud as a key author of the article. Thalamus and APGO personnel worked closely together on ideas for future improvements. APGO gained key insights not only into planned but unreleased Thalamus features, but also into Thalamus's proprietary and economically valuable methodologies, processes, impressions, patterns, plans, compilations, formulas, designs, methods, techniques, procedures, and programs, for the design and improvement of residency application software.

49.    On August 18, 2020, the AMA, APGO, and Thalamus entered into an agreement entitled "Pilot Agreement on Behalf of Participating Residency Programs" (as amended, the "Pilot Agreement" or "Agreement"), under the RRR grant, which itself was part of the AMA's Reimagining Residency initiative. As PI for the grant, Hammoud was the lead negotiator of this Agreement on behalf of the AMA and APGO. The Agreement contains strict terms regarding the AMA's and APGO's use of information about Thalamus and its offerings. In particular, the AMA,

16

APGO, and the individuals at those organizations, including Hammoud, are prohibited from using any information obtained in connection with the Pilot Agreement—including any information whatsoever about Thalamus's products and services—as part of an effort to build any product or service with features similar to or competitive with those offered by Thalamus. A true and correct copy of the Agreement is attached as **Exhibit A** to this complaint.

50.    Through a separate letter agreement with APGO, driven by Hammoud, Thalamus generously agreed to, on a complimentary basis, upgrade any participating OBGYN programs from Thalamus Core to Thalamus Prime, which at the time was a bundled product offering that included Cortex, Itinerary Wizard, and Thalamus Video as add-ons to Thalamus Core.

51.    Thalamus believed in the goals of the RRR Project and was happy to be a part of these efforts to improve and streamline the residency application and interview process, for the benefit of GME programs, incoming medical residents, and the health care system as a whole.

52.    The Agreement involved Thalamus sharing its own Restricted Information with the AMA, APGO, and Hammoud. Section 4(d) of the Agreement places several restrictions on the AMA's and APGO's use of any information related to "Aggregate Pilot Data, the Service Offerings, or Thalamus's confidential and proprietary information" (the "Restricted Information").

53.    Under Section 4(d), the AMA and APGO are prohibited from using the Restricted Information "to build a competing service or product in competition with the Service Offerings (which shall include any product or service with similar functionality to the Service Offerings, regardless of whether offered to third parties by such party . . . .)"

54.    Section 4(d) also prohibits the AMA and APGO from copying the Service Offerings. The "Service Offerings" are Thalamus's "application management, scheduling, and virtual interview platform" "as well as any services, features, or functionality associated therewith." In fact, the AMA and APGO cannot even "*knowingly permit or facilitate*" Liaison to "copy the Service Offerings" or "use information from . . . the Service Offerings . . . to build a competing service or product[.]" (emphasis added).

17

55.    The parties to the Agreement, in recognition of the serious risks to Thalamus of misuse of the Restricted Information, agreed to further clarifying language regarding the only circumstances in which the AMA or APGO could become involved in purported development of a product or service that competed with the "Service Offerings." Specifically, under Section 4(d), the AMA and APGO were barred from contributing to such efforts unless they did so entirely with a "clean team," *i.e.*, with personnel other than those that received access to the Restricted Information.

56.    The Thalamus/AMA/APGO pilot project was a resounding success. The software was utilized by 122 (43%) OBGYN residency programs and nearly all applicants, resulting in the scheduling and completion of around 10,000 interviews, including support of OBGYN's novel interview offer release day.

57.    Further, the process achieved such high satisfaction scores from programs and applicants (and excitement from APGO leadership) that the AMA and APGO asked to extend the pilot program to the 2021–2022 residency season. Thalamus agreed.

58.    That year, the retention rate was over 98% and resulted in even more OBGYN programs taking advantage of the offering, with over 130 programs participating. The program was so successful that nearly all residency programs converted to full paying customers, paying over $3,000 per yearly subscription starting in the 2022–2023 application cycle.

59.    Until Liaison and Hammoud's campaign of false and misleading advertising, the number of OBGYN programs continued to expand, representing the largest single specialty adoption of not only Thalamus, but any other residency interview scheduling system up to that time.

60.    The relationship between Thalamus and APGO went beyond providing access to Thalamus for OBGYN programs. Thalamus collected valuable data, which it provided to the AMA, APGO, and grant leadership in aggregate form for research purposes in connection with the RRR Project. The RRR Project, Hammoud, and Thalamus worked to jointly publish research based on such data.

18

61.    Even upon conclusion of the second year of the grant, Thalamus continued to have regular discussions with and provide data to RRR leadership on a complimentary and collaborative basis under the Agreement. Thalamus also worked closely with various AMA and APGO personnel on plans for future collaboration. Thalamus worked directly with Hammoud for years on new collaborative initiatives as part of the RRR Project.  Hammoud serves as senior advisor for Medical Education Innovations at the AMA, as an ex-officio APGO board member, and as the RRR Grant Principal Investigator. Hammoud was also formerly the President of APGO.

62.    Thalamus shared with Hammoud OBGYN Standardized Letter of Evaluation ("SLOE") adoption numbers by United States M.D., United States D.O., and international medical graduate ("IMG") medical students. This data was then used in a presentation by Hammoud at a featured session at the CREOG & APGO Annual Meeting held at the end of February 2023.

63.    Hammoud, the AMA, and APGO explained in numerous meetings following their collaboration with Thalamus that funding may be available for future development and collaboration with Thalamus because of the AMA and APGO's desire to make available a residency applicant compatibility index ("ACI") tool.

64.    The ACI tool would advise on pairing medical residency applicants and programs and ideally would suggest or rank the applicants and programs by realistic and best alignment to form potential matches.

65.    Thalamus's existing product Cortex and soon-to-come Cingulate tools would both provide this same type of functionality.

66.    In 2021, the RRR Project grant administrator and other members of the grant team, asked Thalamus for more information about the Cortex and Cingulate tools. They inquired about what metrics and attributes would and would not be captured by Cortex and Cingulate. This information was to be shared with the RRR Project's ACI working group.

67.    Thalamus had numerous other conversations with the AMA about Cingulate as well, with Hammoud present, including through a Microsoft Teams presentation in 2021, where John Andrews, AMA Vice President for GME Innovations, whose organization provided the funds

19

for the RRR grant, said "Cingulate 😊 This is one of the most fun conversations I've had this week."

68.    The AMA further asked Thalamus to create mockups of Cingulate incorporating the branding of AMA's Fellowship and Residency Electronic Interactive Database Access ("FREIDA") service.

69.    Notwithstanding this obvious enthusiasm for development of an ACI tool through Thalamus, and accompanying grant funding, such funding never materialized. On information and belief, Hammoud used her influence to stop such funding, to assist Liaison in establishing itself as the dominant player in the residency application market.

70.    Instead, Hammoud and RRR "developed" their own ACI tool by copying what they learned from Thalamus, which is now embedded and integrated into the AMA's FREIDA product, setting the tone for further development using Thalamus's Restricted Information in ResidencyCAS.

71.    Driven by promises of revenue sharing along with Hammoud's personal and financial entanglements, immediately following the pilot program with Thalamus, the AMA and APGO, together with ACOG, found a new partner in Liaison, a private equity backed, for-profit company seeking to break into the GME market and ultimately force out the ERAS application and Thalamus.[1] In 2023–2024, Liaison, assisted by AMA and APGO affiliates who were restricted by the clean-team provision, including Hammoud herself, together with other members of RRR working under Hammoud's leadership, developed a competitive product called ResidencyCAS in direct contravention of their contractual obligations. Hammoud's University of Michigan bio

---

[1] Though Liaison and Hammoud have attempted, within the GME community, to brand ResidencyCAS's launch as increasing freedom of choice, Liaison now admits that its true intent is to eliminate ERAS and Thalamus altogether and consolidate the marketplace under its own banner. In Liaison's July 2026 Article, Liaison contends that GME is desperately in need of Liaison to take over the market as a single centralized service for *all* residency applications across *all* specialties (article available at: https://www.ecampusnews.com/campus-leadership/2026/07/10/the-case-for-centralized-admissions-in-graduate-medical-education/). Such a move would eliminate the ERAS application.

explicitly confirms that "she led the development of ResidencyCAS," in clear violation of the contractual bar on involvement in such development by those, like Hammoud, with access to Thalamus's Restricted Information (referenced bio available at: https://medschool.umich.edu/medical-school-news/maya-m-hammoud-md-mba-appointed-assistant-dean-faculty-clinical-track).

**Thalamus Enters Into a Contractual Relationship with Liaison**

72.    On or about October 5, 2022, Thalamus and Liaison entered into a Mutual Confidentiality and Nondisclosure Agreement (the "MNDA").  It was Thalamus's understanding that, based on this conversation, Liaison was interested in evaluating a potential partnership with or purchase of Thalamus.

73.    Under the auspices of the MNDA, Thalamus shared sensitive information about its products and services with Liaison. Thalamus shared this sensitive information via a Microsoft Teams meeting on October 21, 2022. The meeting included, on behalf of Liaison, Chief Strategy Officer Craig Stanford ("Stanford") and Vice President of Centralized Application Service ("CAS") Products Mike Margitich ("Margitich"), who now leads product development for ResidencyCAS. Attendees on behalf of Thalamus included Chief Executive Officer and Founder Jason Reminick, MD, MBA, MS ("Reminick") and then Chief Operating Officer Kevin Lindbergh.

74.    During this meeting, Reminick asked about Liaison products that seemed similar to those of Thalamus and asked whether Liaison desired to enter the GME space. Both Stanford and Margitich stated that Liaison did not have any offering like those of Thalamus, nor did Liaison have any desire to create its own entry into the GME space. Stanford and Margitich stated that one of the reasons Liaison was interested in Thalamus was because of Thalamus's expertise and success in working with GME programs.

75.    Stanford followed up by email on December 12, 2022, indicating Liaison's continued interest in a merger and acquisition transaction with Thalamus:

21

Jason, thanks for being available to catch up today. I'm very encouraged that M&A might be a possibility! In the interest of both parties, we generally try to get a snapshot look at basic metrics for valuation purposes to see if we're in the same ballpark. I'm attaching a basic template that is intended to get that conversation started without being burdensome. In parallel, maybe think of questions you might have for me about Liaison and our thinking going forward. We can reconvene to discuss both and see if we're in alignment. Let me know if you have any questions or would like clarification on the items in the excel file. Thanks in advance! Looking forward to our next discussion!

76. Following the initial discussion with Liaison, Reminick requested to speak with George Haddad ("Haddad"), Founder and CEO of Liaison, about what a broader partnership or merger and acquisition would involve. A meeting was scheduled for January 19, 2023.

77. Approximately six hours after Reminick confirmed the meeting, it was cancelled due to a purported scheduling conflict for Haddad. Reminick requested an update on January 25, 2023, to which Stanford responded:

Hi Jason. Circling back on timing for an intro discussion with George. We're starting diligence on another M&A opportunity that is further along. They've accepted our LOI and we're starting round one diligence ahead of a final LOI. This should take about four weeks of heads-down effort for several of our exec team. Since the timing is relegated to a deadline, we're going to need to push our discussion out a few weeks, likely to the end of Feb. Sorry for the delay. Let me know if you have questions or would like to discuss further. I appreciate your patience.

78. The January 25 email was the last communication that Reminick, or anyone else at Thalamus, received from Liaison.

**Defendants Develop a Competing Application in Violation of the Agreement's Restrictions**

79. Notwithstanding the Pilot Agreement's clear prohibitions against development of any competing technology other than through a clean team, on July 27, 2023, however, APGO and ACOG announced a "specialty-wide initiative, in collaboration with Liaison International, to design and implement an obstetrics and gynecology residency application to be used starting in the 2024–25 residency application cycle." They also announced that this "emerged from efforts catalyzed by grant-funded work with the AMA Reimagining Residency grant program, "Right Resident, Right Program, Ready Day One," a coordinated effort amongst APGO, ACOG, and CREOG." The signatories of the message announcing this initiative included Hammoud (in her capacity as Grant Principal Investigator for the "Right Resident, Right Program, Ready Day One"

initiative), the APGO executive director, the APGO President, the Chair of CREOG, and the University of Michigan's residency program director, who was a close ally of Hammoud's and who had also received Thalamus's Restricted Information pursuant to the Pilot Agreement. Hammoud, the APGO executive director, the Chair of CREOG, and the APGO President are all members of and/or hold leadership roles on the Right Resident, Right Program, Ready Day One initiative. Hammoud is a key member of the initiative's leadership team.

80.    As ResidencyCAS began to publicize elements of its offerings at conferences and on its website, it became clear that everything provided by ResidencyCAS other than the residency application component itself (the "ResidencyCAS Wrapper") was based primarily on Thalamus's software and the Restricted Information. Thalamus developed and gathered this Restricted Information over years and then confidentially shared it with APGO, AMA, and Hammoud under explicit restrictions set forth in the Agreement. Liaison then obtained this confidential Restricted Information through its allies at AMA and APGO, including Hammoud, to develop ResidencyCAS.

81.    Because Liaison is based in Massachusetts, on information and belief, the development of ResidencyCAS and the incorporation of Thalamus's Restricted Information into ResidencyCAS occurred in Massachusetts. On information and belief, Hammoud's communications to Liaison in furtherance of her and Liaison's development of ResidencyCAS and her—as well as APGO and AMA's—sharing of Thalamus's Restricted Information with Liaison took place in Massachusetts.

82.    Liaison had notice of the AMA and APGO's obligations to Thalamus. To the extent it was not already aware, an August 10, 2023, letter from Thalamus's counsel (the "August 2023 Letter"), sent soon after the announcement that Liaison and APGO were jointly developing ResidencyCAS with the support of the AMA, informed Liaison of the details of the Agreement.

83.    The August 2023 Letter also informed Liaison that the Agreement goes beyond information specifically shared with representatives of the AMA and APGO; it also protects any

Restricted Information that Thalamus may have provided to a residency program under the Agreement.

84.    Despite Liaison's awareness of this partnership, and the Agreement's clean-team provision, it moved forward with the development of ResidencyCAS with the AMA's, APGO's, and Hammoud's support. ResidencyCAS now offers not only an application to compete with ERAS and the AAMC, but also a suite of software to support the application and interview process in direct competition with Thalamus's offerings.

85.    Liaison, with the assistance of Hammoud and organizational allies acting at her direction, also engaged in false and misleading advertising and anticompetitive business practices to support a large-scale effort to freeze AAMC and Thalamus out of the OBGYN market. Liaison and Hammoud worked to consolidate control over each specialty into which ResidencyCAS expanded, using unfair, extracontractual, and anticompetitive means to foreclose competitors and entrench ResidencyCAS as the exclusive platform. While Liaison and Hammoud have attempted, within the GME community, to brand ResidencyCAS's launch as increasing freedom of choice away from the ERAS application, Liaison is simultaneously being clear that it is not interested in choices within the residency application marketplace. A Liaison representative recently published an article making the case for Liaison as a single centralized service for *all* residency applications across *all* specialties (available at: https://www.ecampusnews.com/campus-leadership/2026/07/10/the-case-for-centralized-admissions-in-graduate-medical-education/).

86.    APGO, ACOG, and other organizations influenced by Hammoud have been barring Thalamus from conferences and trade shows without explanation. Thalamus's efforts to determine whether there was any legitimate basis for these exclusions were met with stonewalling.

87.    This is unsurprising given the clear and concerted effort by Liaison and Hammoud to seize market share for ResidencyCAS despite its technical shortcomings and Liaison's own lack of any meaningful experience or track record in GME. By excluding Thalamus from industry trade shows, they block Thalamus from access to the residency programs that must choose between

24

ResidencyCAS, Thalamus, or both, including when these OBGYN programs were customers and users of Thalamus.

88.    Liaison's tactics have found a vulnerable target, in part because Liaison's private equity backers simply do not play by the same rules the GME community is used to. As an example, the privacy of applicant data is considered sacrosanct to organizations within the GME community, including Thalamus. Yet soon after starting work for Liaison, a former program coordinator improperly used her former program's access to Thalamus systems to improperly view and download applicant data. Given GME's historical values and ethical guideposts, it is perhaps unsurprising that this individual's former program did not "lock its doors" by promptly rescinding her access or changing passwords upon her departure for Liaison. Taking advantage of her former program's mistake, this Liaison employee quickly entered the system, viewed data related to several applicants, downloaded data related to at least one specific applicant, and exited again with additional information about applicant data *and* the internal workings of Thalamus's systems. Prior to Liaison's entry into GME, even for-profit companies would consider such a move anathema. To Liaison, the applicants' data privacy was simply a necessary casualty of its efforts to garner additional intelligence on Thalamus. Thalamus was quickly alerted to Liaison's unauthorized incursions into its systems and blocked further access and took remedial measures, including immediately contacting the residency program for which the Liaison employee previously worked to inform them the account was still active and direct outreach to Liaison, to prevent the misuse of applicant data.

89.    To secure Liaison's grip on first OBGYN and then other specialties, Liaison and Hammoud have relied on false and misleading representations that Liaison had already garnered universal adoption within OBGYN, long before this was true. One goal of this campaign was to pressure OBGYN programs into using ResidencyCAS by sowing fear that not accepting ResidencyCAS would cause the programs to miss out on strong residents within the specialty. In furtherance of that goal, Liaison, Hammoud, representatives of the AMA, APGO, ACOG, and others repeatedly claimed in varying forms and fora that ResidencyCAS was *the* application for

25

2024–2025 OBGYN residency or that OBGYN programs were somehow *required* to use ResidencyCAS. Although neither of these statements was true, they worked. Numerous programs that had expressed a strong desire to stay with ERAS and Thalamus ultimately made the switch to ResidencyCAS specifically after outreach from APGO, ACOG, the AMA, and Hammoud repeating these false and misleading talking points and pressure tactics.

90.     Liaison, Hammoud, and allies working at their direction have made a litany of other false and misleading statements praising ResidencyCAS and/or denigrating Thalamus and its own offerings. They have used their websites, web presences, and a number of presentations—many at the same conferences from which Thalamus has been excluded—to launch a campaign of false and misleading advertising and misinformation designed to move residency programs away from Thalamus and the AAMC.

91.     Among other false and misleading statements, Liaison, Hammoud, and their surrogates at APGO and ACOG—and later other specialty groups—repeatedly promised the residency programs that (a) ResidencyCAS had all the same features Thalamus has, and (b) this software was already in use elsewhere. Both statements were false.

92.     First, ResidencyCAS did its best to copy Thalamus but was, and is still, missing critical features. These features were missing because Liaison still needed to develop them. In many cases, they remained in development even after the completion of the OBGYN pilot and as the same promises were being made to Emergency Medicine and now to other specialties.

93.     Second, contrary to defendants' public assurances to the OBGYN programs, these Thalamus-like features had never been used in Liaison's other offerings in GME or any other market where Liaison offers its services. They were developed (and, in many cases, are still being developed) specifically for first-time use in ResidencyCAS.

94.     And ResidencyCAS's lack of real-world operational experience, which Liaison and Hammoud worked so hard to conceal, had real and meaningful consequences. For example, in around October 2025, deficiencies in ResidencyCAS's unfinished and insufficiently vetted interview management system moved hundreds of Emergency Medicine residency candidates

across various programs from ResidencyCAS's program portal to the "Interview Candidate" and "Invited & Ready" phases of its interview portal, falsely leading these candidates to believe that the programs had selected them for interviews. OBGYN applicants had experienced near-identical challenges the season prior. Despite another year of false and misleading statements about ResidencyCAS's efficacy, these issues still had not been fixed. ResidencyCAS assured programs that no invitations had been sent, but this was later discovered to be false. Then, later that month as programs began to schedule a larger volume of interviews, ResidencyCAS experienced repeated crashes as the system was not designed to handle the load inherent in residency interview season.

95.    And the impacts of these ResidencyCAS glitches were not the only negative consequences of ResidencyCAS's failure to keep its promise to include all the same features as Thalamus. OBGYN and Emergency Medicine residency program leaders forced to use ResidencyCAS complained that, among other things, it included an overly formalistic interview scheduling process with little or no flexibility, and technical gaps complicating the invitation emailing process, with multi-step processes to move candidates forward to an interview.

96.    Liaison, Hammoud, and industry allies working at their direction also repeatedly suggested that ResidencyCAS would integrate Artificial Intelligence features. This included a presentation by Liaison personnel at a 2025 professional conference (which, per continuing education guidelines, should have been *verboten* regardless given Liaison's status as an exhibitor at that conference). To date, ResidencyCAS has not utilized the type of AI features advertised by Liaison and other defendants.

97.    Liaison, Hammoud, APGO, the AMA, and ACOG have developed the ResidencyCAS product with the assistance of Thalamus's Restricted Information, in breach of APGO's and the AMA's contractual commitments to Thalamus under the Agreement. Liaison and Hammoud induced this breach with full knowledge of those commitments. Liaison, directly and through its industry backers, has also engaged in false advertising on behalf of ResidencyCAS. Liaison and Hammoud also worked with these same groups to ensure that Thalamus and the AAMC were excluded from the residency application market, beginning with the OBGYN

27

specialty. All of this was in furtherance of maximizing Liaison's share of the residency application market, first in OBGYN and soon, if Liaison succeeds in its recently professed desire to consolidate residency applications under its banner, in all specialties. This will enrich Liaison, Hammoud, their allies, and Liaison's private equity owners at the expense of Thalamus and the medical residents themselves.

**Defendants Begin Marketing ResidencyCAS With False and Misleading Advertising**

98.     On July 27, 2023, ACOG released an "Embargoed Message for National Medical Education Organizations" to CEOs and other leaders throughout the GME community (the "July 27 Release"). The July 27 Release announced ACOG's "specialty-wide initiative, in collaboration with Liaison International, to design and implement an obstetrics and gynecology residency application to be used starting in the 2024-25 residency application cycle." This residency application platform was Liaison's "ResidencyCAS" system. ResidencyCAS has been billed as a medical residency application and accompanying suite of software used to facilitate the application, interview process and match of prospective residents with OBGYN programs.

99.     The July 27 Release also noted that this "Specialty-wide initiative emerged from efforts catalyzed by grant-funded work with the AMA Reimagining Residency grant program, 'Right Resident, Right Program, Ready Day One,' a coordinated effort amongst the Association of Professors of Gynecology and Obstetrics (APGO), ACOG, and CREOG."

100.    The July 27 Release was addressed to several AMA stakeholders and was signed by a group of individuals including: the Chair of CREOG, the APGO executive director, the APGO President, and Hammoud.

101.    The next day, on July 28, 2023, there was a session to formally announce this initiative to the OBGYN community at the 2023 CREOG Education Retreat in San Diego, California ("Retreat"). The APGO and RRR grant leadership, including Hammoud, attended the Retreat.

102.    Thalamus is informed and believes that, at the Retreat, there were several inquiries questioning why the APGO and RRR grant leadership had chosen not to work with Thalamus

28

given that the majority of the OBGYN specialty used Thalamus software. Upon information and belief, Hammoud, APGO, and/or other OBGYN/RRR grant leadership falsely communicated that the group had approached Thalamus, but Thalamus was not "flexible enough" and would not "agree to customize to the level that our specialty needs." Thalamus was never approached by APGO or Hammoud in this regard and it never stated that its willingness to customize was limited in any way.

103. Liaison is engaged in revenue sharing with its GME partners and, upon information and belief, this is driving Hammoud's and these organizations' commitment to promoting Liaison within the GME space. Thalamus's understanding of this covert revenue sharing stems from a conversation between Hammoud and Thalamus's CEO Reminick, during dinner at the 2022 NRMP conference in San Diego, CA. While bragging about her budding relationship with Liaison, Hammoud let slip that one of the reasons she and the OBGYN organizations were planning to work with Liaison was that Liaison engaged in revenue sharing with its organizational partners. This was later confirmed at a meeting held by CORD-EM at their 2024 Scientific Assembly, where specialty leadership pushed ResidencyCAS on attending Program Directors and noted specifically that the OBGYN specialty was receiving a revenue share with ResidencyCAS and that Emergency Medicine would too. Representatives of Emergency Medicine trade groups confirmed Liaison's willingness to engage in revenue sharing in presentations on ResidencyCAS given in 2025. Additionally, Thalamus is informed and believes that leadership of other specialties (besides OBGYN and EM) were contacted by Liaison, offering these specialties a revenue share in exchange for partnership.

104. Contrary to the claims of APGO leadership that Thalamus was not "flexible" and unwilling to customize, Thalamus CEO Reminick met several times with Hammoud and RRR Grant members including the then president-elect of APGO. Several inquiries were made concerning potential additional capabilities of Thalamus and/or products/features that could be created to further support OBGYN, APGO, and RRR's project team in creating additional innovation within the OBGYN transition to residency. These additional features included artificial

29

intelligence, machine learning, and other capabilities about which Hammoud and the RRR team had expressed interest. Reminick made it clear in these and other subsequent discussions that Thalamus would always be willing to work with them to create additional solutions.

105. Additionally, APGO posted materials to the RRR website (https://apgo.org/page/rrrapplicationplatform), which included a summary of the initiative, a list of frequently asked questions (FAQs), an overview video of the offering, and a timeline for implementation. The website explicitly states that:

> Emerging from efforts catalyzed by grant-funded work with the AMA Reimagining Residency grant program "Right Resident, Right Program, Ready Day One", this initiative led by ACOG, CREOG and coordinated with the Association of Professors of Gynecology and Obstetrics (APGO) will improve the ability of obstetrics and gynecology residency programs to evaluate candidates holistically and better ensure that our obstetrics and gynecology trainees are able to meet the needs of the communities for whom we provide care.

106. The message also notes that the offering "will incorporate the entirety of interview season functions, from application submission, review, interview offers and interviews, to rank list submission." Another website page (https://apgo.org/page/transformingtheumetogmetransition) also clearly states that the project is an APGO grant "led by Principal Investigator, Maya Hammoud, MD, MBA . . . ."

107. On July 29, 2023, Hammoud posted on X (formerly Twitter) what appeared to be an official announcement, which again included a statement that, "This platform will provide valuable data and insight which will further support collaborative efforts." (*See* https://twitter.com/Maya_Michigan/status/1685367408842911744).

108. Around the same time, Liaison announced its ResidencyCAS system. In addition to offering a residency application itself, Liaison advertised ResidencyCAS as offering many features and functionality of the Service Offerings in Thalamus's products, including interview scheduling (akin to Thalamus's Core platforms), an embedded video interview platform, a scoring and rank order list component (akin to Thalamus's Video and Core platforms), holistic review tools (akin to Thalamus's Cortex platform), and specialty-wide analytics (akin to Thalamus's Cerebellum platform). Liaison presented such features as already in existence.

109.    Liaison's advertising of ResidencyCAS evidences many similarities between ResidencyCAS and Thalamus's Service Offerings.  These include nearly identical drag-and-drop rank lists with cards, geographic outcome heat maps, and a video interview platform with identical split-screen setup with real-time scoring functionality.

110.    Additionally, Liaison's marketing video for ResidencyCAS (https://www.youtube.com/watch?v=4rqtQhlfpys) notes, "What sets ResidencyCAS apart is the utilization of world class data science and machine learning models. The data science team analyzes application materials and aligns them with best practice holistic review models." Because the AMA, APGO, Liaison, ACOG, and Hammoud were intimately familiar with Thalamus's data science team, their research, and Thalamus's Cortex application review tool, the statement that using such models "sets ResidencyCAS apart" was positioned to confuse the broader market. Thalamus uses comparable data science and machine learning models. ResidencyCAS is not distinct from Thalamus in this way, and the statement that this "sets ResidencyCAS apart" is therefore false and misleading.

111.    Liaison's promotional video, the timing of which suggests it was released in coordination with APGO's announcement (July 2023), gave the false and misleading impression that ResidencyCAS is a system that Liaison already offered and, specifically, already offered to medical residency programs. While Liaison did offer application tools to healthcare educational programs (*e.g.*, pharmacy residency), it did not offer such tools to medical residency programs. Nor did it offer most of the "innovative" tools ResidencyCAS claimed to already have in the other application markets where Liaison offered its services. And in Liaison's promotional video, there were several suggested tools which had not yet been built and, on information and belief, to this day have never been offered to any program in any discipline, let alone GME.

112.    This did not, however, stop Hammoud and Haddad from claiming that ResidencyCAS *did* have an embedded interview scheduler when presenting at a session during the 2024 Educating Leaders Conference for the American Association of Colleges of Osteopathic Medicine ("AACOM") in Kansas City, Missouri, on or about April 16, 2024. Liaison's

31

ResidencyCAS introduction video and ResidencyCAS User Guide each also specifically claimed that ResidencyCAS had an embedded interview scheduling function. Unlike Thalamus's offering, ResidencyCAS had no such function when it was announced in the Liaison promotional video. It is questionable whether the described function even existed prior to the start of the residency recruitment season in September 2024. Prior to the start of the 2024 season, Liaison removed this statement from its user-guide page, but OBGYN residency programs were already locked into ResidencyCAS and the damage was done. Once a version of this feature (with significantly limited functionality) was actually being built piece-by-piece, Liaison continuously updated the guide to reflect new developments—further demonstrating that, despite defendants' suggestions, the software did not exist when it was promised to programs. Ultimately, the severely limited interview scheduling functions provided to OBGYN programs in the 2024–2025 season fell drastically short of defendants' promises for ResidencyCAS.

113. Liaison also advertised in early 2024 that ResidencyCAS was "real software" and further implied, in numerous fora, that the components of ResidencyCAS had been in use for years.

114. Such false and misleading claims were also made beyond the OBGYN community. Haddad and Margitich presented at the Society for Academic Urologists ("SAU") 2024 Winter Meeting on January 20, 2024, in Las Vegas, Nevada. At this conference, Liaison told the assembly of potential future customers that it had been "doing residency for years." Margitich further stated that "everything I'm going to show you today is real software" and that it was in use by other health professionals "right now."

115. None of these statements were true. Liaison had never previously run a medical residency application and the ResidencyCAS package Margitich was advertising included numerous components that had never previously been a part of any Liaison product. Margitich did not show an interview scheduling functionality; he only mentioned its availability, suggesting that this functionality already existed but seemingly indicating through the absence of any demonstration that even the limited functionality ResidencyCAS ultimately provided had still not yet been produced at that time.

32

116.    Liaison's website and the ResidencyCAS User Guide each claimed that ResidencyCAS was built with data received from applications. ResidencyCAS, however, had never previously received any GME residency applications from which to draw data, and, as explained above, data privacy obligations should have barred any sharing of applicant data with Liaison.

117.    Hammoud and others acting at her direction also repeated this same false and misleading claim in a presentation at the 2024 Accreditation Council for Graduate Medical Education ("ACGME") Annual Education Conference in Orlando, Florida, on March 8, 2024.

118.    Similarly, Liaison and the defendants also repeatedly suggested that ResidencyCAS would integrate Artificial Intelligence features, but to date, ResidencyCAS has not utilized the type of AI features advertised by Liaison and other defendants.

119.    Liaison's video, advertisements, and statements taken together are likely to have induced and to continue to induce stakeholders in the residency application space to stop working with companies such as Thalamus as well as provide false comfort that ResidencyCAS is a proven solution in the GME space. It is not.

120.    Presumably in part due to its association with Hammoud, ResidencyCAS initially targeted OBGYN residency programs for the product's first year. In year two, Liaison, Hammoud, and Liaison's other Ambassadors within APGO and elsewhere in GME targeted Emergency Medicine. Like OBGYN, Emergency Medicine is another of GME's largest specialties. On information and belief, Liaison intends to progressively expand its reach to additional specialties over the next several years and has made offers of revenue sharing to other specialties.

121.    Liaison and its partner organizations have sought to completely corner the OBGYN and Emergency Medicine markets to the exclusion of the ERAS application, Thalamus, and any other potential competition, and to do so based on unfair and deceptive practices, including false and misleading statements about ResidencyCAS's capabilities and adoption by users.

122.    Because OBGYN (and then Emergency Medicine) programs were told that ResidencyCAS would give them access to all the same features that ERAS and Thalamus included,

33

this led programs to switch from ERAS and Thalamus to ResidencyCAS or to use ResidencyCAS exclusively instead of in conjunction with Thalamus.

123.    Multiple programs specifically informed Thalamus that the program would not continue using Thalamus because ResidencyCAS would, they wrongly believed, incorporate all the same functionality of Thalamus and/or were under the belief that specialty leadership was preventing them from using Thalamus or strongly urging them not to use Thalamus.

124.    Liaison's unfair and deceptive practices were assisted by Hammoud whose statements, as senior advisor for Medical Education Innovations at the AMA and RRR Grant Principal Investigator for the AMA/APGO initiative, an ex-officio APGO board member, and APGO's former President still listed among APGO leadership, carry the weight of these organizations.

125.    For example, Hammoud participated in an April 16, 2024, presentation at the AACOM (osteopathic medicine) conference with Haddad, at which time the two falsely and misleadingly claimed that ResidencyCAS had an embedded interview scheduling function.

126.    An article in the Journal of Surgical Education, whose co-authors included Hammoud as well as ACOG's Chief of Education and Academic Affairs, also suggested that ResidencyCAS had an embedded interview scheduler. The first footnote to this same article claimed that ResidencyCAS would be launching for all OBGYN residency programs in 2024, though entirely concealed Liaison's involvement and profit motive.

127.    While programs still held out from using ResidencyCAS, Hammoud repeatedly stated as fact to leaders of other programs that one hundred percent of OBGYN residency programs in the United States would be using ResidencyCAS for the 2024–2025 application season and that ResidencyCAS would be the *exclusive* application for OBGYN programs.

128.    The AMA FREIDA website displayed a false banner claiming that "100% OBGYN residency programs in the US will be transitioning to ResidencyCAS for 2024-2025." On information and belief, this was directed by Hammoud.

129.    On June 2, 2024, Hammoud posted that ResidencyCAS was "the new OBGYN application, which will be opening for all #OBGYN applicants on June 5, 2024" (s*ee* https://x.com/Maya_Michigan/status/1797322346409218176), giving the false impression that all OBGYN programs would be using ResidencyCAS to accept applications. On June 5, 2024, she again posted about the launch, this time referencing ResidencyCAS exclusively as the ACOG application, ignoring Liaison and its private equity backing:  "the new @acog #residency application for #OBGYN #ResidencyCAS is now live and open for business!" (*see* https://x.com/Maya_Michigan/status/1798341923393946088).

130.    Hammoud's statements were directed at OBGYN residency programs, including numerous programs located within Massachusetts, and were intended to entice and/or compel residency programs to contract with Liaison and use ResidencyCAS.

131.    Other APGO spokespeople have also made false and misleading claims about ResidencyCAS. The chair and chair emeritus of the Association of Program Managers in Obstetrics and Gynecology ("APMOG")—together with other ACOG, APGO, and CREOG leadership—sent a May 16, 2024, email to a program director list-serve stating: "As a reminder, all (100%) OBGYN residency programs in the US will be transitioning to ResidencyCAS for 2024–2025." This email explicitly instructed programs that ERAS had sent a survey and that all programs should select "Will have open positions, but will not use ERAS" from the drop-down list. That is, OBGYN programs were instructed by ACOG, APGO, CREOG, and APMOG that they *had* to opt out of ERAS under the false assertion that 100% of OBGYN programs had decided to use ResidencyCAS, which they had not. The obvious falsehood of this statement is laid bare by the inherent irony of the assertion: if all OBGYN programs had already agreed to transition to ResidencyCAS, then no such reminder would be necessary. During a CORD-EM presentation promoting ResidencyCAS to Emergency Medicine programs, an Emergency Medicine representative informed attendees that the OBGYN specialty (which was being driven by Hammoud) "didn't give [programs] a choice" in moving to ResidencyCAS.

132.   The false and misleading emails from ACOG and others did not start in 2024, however. ACOG, CREOG, and APGO leadership, including Hammoud and Connolly, had already sent a joint message to various key players within GME nearly a year earlier, on July 27, 2023, before development of the application had even begun, containing the assertion that: "This new specialty-specific residency application will be used across all the obstetrics and gynecology residency programs in lieu of the Electronic Residency Application Service (ERAS)."

133.   This characterization of ResidencyCAS being mandatory continued through at least 2025. In a May 22, 2025, OBGYN webinar featuring Hammoud, Margitich, and another representative of RRR, attendees were told that in the 2025–2026 session, as with the 2024–2025 one, "100% of OBGYN residency programs will only be accepting applications through ResidencyCAS" and "will not be accepting applications through ERAS."

134.   None of ACOG, APGO, CREOG, any of the individuals on the May 16, 2024, email, or any of the individuals presenting at the May 22, 2025, webinar have or ever had the power to force all OBGYN residency programs to use any specific residency application, including ResidencyCAS.

135.   Having found success with this false and misleading advertising in the OBGYN market, Liaison, Hammoud, and others affiliated with APGO who are acting as emissaries on behalf of Liaison, are repeating this false and misleading advertising playbook with Emergency Medicine and other specialties.

136.   In 2025, while courting Emergency Medicine programs, Hammoud and other representatives continued to claim, falsely, that ResidencyCAS was a single platform for the entirety of the interview season. They further indicated that this included interview offers and selection and the actual conduct of interviews, all within this single platform, a functionality ResidencyCAS did not have.

137.   Liaison and Hammoud's strategy to expand the ResidencyCAS takeover to Emergency Medicine has begun to bear fruit. On a webinar presented by the Society for Academic Emergency Medicine titled "Preparing for ResidencyCAS: What Advisors and Students Need to

Know," filmed on February 5, 2025, the presenter noted that "it is our intent and our goal to have 100% of emergency medicine programs transition to the ResidencyCAS platform for the next cycle so I would love to say, yes, all programs will be using ResidencyCAS for the 2025–2026 cycle."

138.    Likewise, during a September 2024 town hall held by CORD-EM at their Scientific Assembly, specialty leadership gave a presentation, ostensibly on "alternative application platforms," but which was functionally a marketing presentation for ResidencyCAS. During a Q&A segment, an audience member asked a question about how to get program participants to make the switch to ResidencyCAS, to which the presenter described a conversation with CREOG leadership in which they said, regarding ResidencyCAS adoption, "we just told them we were doing it and didn't give them a choice." During this presentation, speakers also confirmed that CORD-EM was working closely with Liaison on ResidencyCAS adoption and that Liaison agreed to revenue sharing with Emergency Medicine programs if they adopted ResidencyCAS.

139.    On a May 22, 2025, webinar, Margitich stated that for the 2025–26 cycle, all Emergency Medicine programs would be included in ResidencyCAS.

## Liaison And Its Organizational Partners Have Conspired to Exclude Thalamus from Marketing Its Products to Residency Programs

140.    Liaison has conspired with Hammoud and her allies at APGO, ACOG, and CREOG to bar Thalamus from conferences and trade shows. Efforts by Thalamus to determine whether there was any legitimate basis for the exclusion were met with stonewalling.

141.    Thalamus was barred from presenting at the 2024 CREOG & APGO Annual Meeting ("2024 Annual Meeting"), which took place from February 28 to March 2, 2024. Thalamus had traditionally exhibited at annual meetings and planned to do so again. In fact, representatives for the event management company putting on the 2024 Annual Meeting invited Thalamus to exhibit via email on multiple occasions. Thalamus submitted its application to exhibit but its application was ultimately denied. No information as to what Thalamus did or did not do to warrant exclusion was ever provided. In contrast, APGO and ACOG promoted Liaison to the point that it ran training sessions for ResidencyCAS as part of the program schedule.

37

142. The 2024 Annual Meeting is not the first or only time that APGO has excluded Thalamus from presenting while specifically promoting Liaison at the same event. Thalamus was also excluded from the APGO Faculty Development seminar from January 20–23, 2024—at which time Liaison was given the opportunity to hold a two-hour session, and multiple other meetings.

143. Similarly, at the AMA's ChangeMedEd Conference from September 27–29, 2023, in Chicago, one of Liaison's executives presented as an expert on the role of artificial intelligence in residency selection, *without disclosing his Liaison affiliation*, even though Liaison had never participated in a single medical residency application cycle. This continued at the ACGME Annual Educational Conference on February 22, 2025, in Nashville, TN, where this same individual continued presenting himself in the same manner, *again without disclosing his Liaison affiliation.* This time, his presentation described an experimental test of AI with a single residency program, his only experience to date. Despite Liaison touting ResidencyCAS as incorporating AI, it did not in either of its first two seasons. Liaison's leadership has publicly confirmed multiple times that ResidencyCAS does not yet use AI.

144. Liaison was also granted the opportunity to provide training sessions at Emergency Medicine conferences, outside the normal exhibit hall, in a forum that had previously barred for-profit vendors and been reserved exclusively for neutral educational sessions.

145. Exclusion of Thalamus from these trade shows, conferences, and meetings was not a legitimate business decision, but was purely intended to facilitate Liaison's seizure of the market, especially given that approximately 50% of all OBGYN residency programs were still utilizing Thalamus's software at the time of the 2024 Faculty Development seminar and Annual Meeting (not to mention numerous OBGYN fellowship programs that continue to use Thalamus's software to this day and have never made any commitment to use ResidencyCAS, or the many OBGYN residency programs that returned to Thalamus after finding ResidencyCAS alone to be insufficient). Presenting at these events was and is essential for Thalamus to have access to the residency programs that can choose between ResidencyCAS, Thalamus, or both. It is at these events that Thalamus can present its case for why its product offering is superior to ResidencyCAS

38

and convince residency programs to choose its products (as well as communicate and interact with its current customers at fellowship programs and even some residency programs). The purpose and effect of this exclusion was solely to promote ResidencyCAS and reduce the potential choices of application and interview management software for the OBGYN residency programs.

146.    Aside from the clear harms to Thalamus, Liaison and its partners' acts harm the residency system in numerous ways.

147.    It is applicants who will suffer most. Applicants have no say in the application that any particular program or specialty utilizes and yet they are the ones forced to bear the additional costs of ResidencyCAS. ResidencyCAS's current predatory pricing is designed to be slightly cheaper than ERAS, but the situation stands to get much worse for applicants once Liaison has established ResidencyCAS as the sole viable option in the broader residency application market. Across various disciplines—osteopathy, dentistry, podiatry, veterinary, pharmacy, and even non-medical professions like social work—Liaison's cost to applicants is *many multiples* of the current per-application cost of the competing ERAS system. Liaison's overhead for these disciplines does not even include the additional software suite it has developed for GME to compete with Thalamus's wraparound offerings extending beyond the ERAS application itself (which, prior to ResidencyCAS, would be separately purchased by residency programs and would not factor into the overhead passed on to applicants). Since Liaison has been clear to programs that applicants will bear all costs, including the presumed revenue share, these additional costs will ultimately be passed on to applicants as well.[2] Upon information and belief, Liaison intends to dramatically raise the price per application through ResidencyCAS once it has established itself in the GME residency application space. With dramatically increased per-program application costs, lower-income applicants will have difficult decisions regarding each application and will likely not apply to some programs and/or specialties for which they would either have an academic interest and/or

---

[2] With regard to the revenue share, this essentially means that applicants will be paying not only Liaison, but also APGO and other revenue sharing partners, for the right to apply to residency.

be a good match. The end result would be a decrease of lower income applicants, potentially eliminating many top-tier applicants from the programs' and/or specialty's applicant pools.

## COUNTS

### FIRST COUNT
**Federal False Advertising and Unfair
Competition under the Lanham Act, 15 U.S.C. § 1125(a)
(Against Liaison and Hammoud)**

148. Thalamus refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 147 inclusive.

149. Defendants have repeatedly made false and misleading statements, or caused others to make false or misleading statements on their behalf, as set forth herein, including by claiming that ResidencyCAS was the exclusive and required application for OBGYN residency programs, that ResidencyCAS had the same capabilities as Thalamus's offerings, that Liaison had previously deployed ResidencyCAS in GME, that Thalamus did not incorporate data science and machine learning models comparable (or superior) to those in ResidencyCAS, that ResidencyCAS incorporated artificial intelligence, and that certain functionalities that had not yet even been developed were already in existence or even in use, among other false and misleading statements.

150. Liaison and Hammoud are liable for the statements by those acting on their behalf, including the AMA, APGO, ACOG, and CREOG because, as alleged above, those organizations acted at Liaison's and Hammoud's direction, in concert with them, and as part of the same coordinated scheme to corner the OBGYN and, ultimately, broader GME residency application markets. Liaison and Hammoud authorized, controlled, and derived direct commercial benefit from these statements, which were made on Liaison's behalf and in furtherance of the parties' common design.

151. Defendants' false, deceptive, and misleading statements and advertisements were directed at residency programs in multiple states, including Massachusetts. The Massachusetts residency programs targeted by defendants' false advertising scheme included Tufts Medical Center; Boston University Medical Center; UMass Chan – Baystate; UMass Chan Medical School;

Beth Israel Deaconess Medical Center; Mass General Brigham/Brigham & Women's Hospital/Massachusetts General Hospital; and Lahey Clinic.

152. Defendants' actions described above and specifically, without limitation, defendants' misleading advertisements and statements concerning the unfounded similarities between Thalamus's products and Liaison's ResidencyCAS, ResidencyCAS's use of AI, ResidencyCAS's GME track record and the prior use of certain features, as well as advertisements and statements misrepresenting ResidencyCAS's prevalence in the GME space, constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

153. Consumers are likely to be misled and deceived by the defendants' misrepresentations concerning Liaison's ResidencyCAS product and its prevalence in the GME space.

154. Defendants' misrepresentations were material to residency programs' and applicants' decisions regarding which residency application and interview management platform to use, because they concerned inherent qualities and characteristics of the parties' competing products and services, including feature functionality (e.g., interview scheduling, artificial intelligence capabilities), prior track record and reliability, pricing, and market-wide adoption. Programs and applicants reasonably rely on such representations in deciding whether to use, retain, or switch away from a given application platform, and defendants' statements were disseminated to the relevant purchasing public—residency programs and their leadership—sufficiently to constitute commercial advertising or promotion within the residency application market.

155. Defendants knew or should have known that their statements were false or likely to mislead.

156. Defendants' false statements had the result of nearly all OBGYN residency programs switching to ResidencyCAS from ERAS and Thalamus. Thalamus's market share in the OBGYN residency market was approximately 50% in 2024 prior to defendants' launch of their false scheme. ResidencyCAS ultimately achieved 100% market share for the 2024–2025 application cycle. While some programs have subsequently returned to Thalamus, its market share

41

remains much smaller in OBGYN than in other specialties. These lost contracts and sales are the direct and proximate result of defendants' false advertising of ResidencyCAS on behalf of Liaison. Thalamus has been similarly injured by loss of accounts in the Emergency Medicine market. These losses in Emergency Medicine and OBGYN, where defendants have so far focused their wrongdoing, can be clearly attributed to defendants' wrongdoing because they stand in stark contrast to Thalamus's growth elsewhere. Since 2020-2021 Thalamus has grown by more than three-hundred percent (300%), to over 8,000 programs, excluding the specialties where defendants' have so far focused their efforts (OBGYN, Emergency Medicine, and Emergency Medicine combined specialties). Based on this success in other specialties, Thalamus's business has more than doubled since ResidencyCAS was announced. But Thalamus's growth would have been even greater absent defendants' wrongdoing, and as Liaison's July 2026 Article makes clear, Liaison intends to use this same playbook across all specialties. Thalamus stands to lose substantially more accounts if Liaison's anticompetitive actions are not stopped.

157. Thalamus has further been harmed by defendants' false statements in that they have diminished Thalamus's goodwill in the residency application market. Liaison and Hammoud's statements, directly and through allies at AMA, ACOG, APGO, and CREOG, working at their direction falsely contrasted ResidencyCAS and Thalamus with the intent of harming Thalamus's competitive standing. Liaison, Hammoud, and allies working at their direction have made additional false and/or misleading statements regarding Thalamus's performance, reliability, and customer service to OBGYN and Emergency Medicine programs while marketing ResidencyCAS.

158. As an actual and proximate result of defendants' willful and intentional actions, Thalamus has suffered damages in an amount to be determined at trial, and unless defendants are enjoined from further false advertising, Thalamus will continue to suffer irreparable harm and damage to its business, reputation, and goodwill.

159. Pursuant to 15 U.S.C. § 1117, Thalamus is entitled to damages for defendants' Lanham Act violations, an accounting for profits made by Liaison on its sales of ResidencyCAS, as well as recovery of the costs of this action. Furthermore, Thalamus is informed and believes,

and on that basis alleges, that the defendants' conduct was undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Thalamus to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

160. Defendants' false and misleading advertising has caused, and unless enjoined will continue to cause, irreparable harm to Thalamus's business, reputation, and goodwill for which there is no adequate remedy at law, entitling Thalamus to permanent injunctive relief.

**SECOND COUNT**
**Unfair Competition and Unfair or Deceptive Acts in Conduct of Trade or Commerce,**
**(M.G.L. c. 93A, § 11)**
**(Against Liaison and Hammoud)**

161. Thalamus refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 160 inclusive.

162. The parties are engaged in trade or commerce for purposes of M.G.L. c. 93A, § 11.

163. Thalamus and defendants have engaged in business transactions, specifically:

• Thalamus and Liaison entered into the MNDA;

• Thalamus entered into the Pilot Agreement with the AMA and APGO, which was managed and directed on the AMA and APGO's behalf by Hammoud, who also negotiated the Pilot Agreement;

• Liaison has tortiously interfered with the Pilot Agreement between Thalamus and the AMA and APGO;

• Liaison has engaged in anticompetitive acts, including false advertising, tortious interference, and monopolization, intended to maximize its market share in the residency application market at Thalamus's expense;

• Liaison, Hammoud, and their industry allies have engaged in false advertising and other unfair business practices on Liaison's behalf with the intent of inducing residency programs to contract with Liaison and not with Thalamus.

164. Hammoud has engaged in trade or commerce in her dealings with Thalamus, Liaison, AMA, APGO, ACOG, and OBGYN residency programs. Hammoud was motivated by business and/or commercial considerations when taking actions and making statements intended to increase Liaison's market share in the OBGYN residency application market. Hammoud's University of Michigan website bio states that she "led the development of ResidencyCAS." On information and belief, as a clinical professor at the University of Michigan Medical School, Hammoud was motivated by Liaison's promise of revenue sharing with residency programs that adopted ResidencyCAS. On information and belief, Hammoud was also motivated to develop professional ties with Liaison and to maintain a prominent role in the residency application software market. On information and belief, Hammoud's motivations were not primarily driven by a sincere belief that ResidencyCAS was a superior platform for applicants nor was she primarily acting as a fiduciary for the nonprofit trade groups she directed to promote ResidencyCAS, but she was acting to advance her own professional and business interests.

165. Defendants' false and misleading advertisements and statements as detailed above constitute an unfair method of competition and an unfair or deceptive act or practice under M.G.L. c. 93A, § 11. In addition, defendants' efforts to exclude Thalamus from industry meetings and conferences constitutes an unfair method of competition and an unfair or deceptive act or practice under M.G.L. c. 93A, § 11.

166. Defendants' conduct in violation of M.G.L. c. 93A took place primarily and substantially in Massachusetts. Liaison's principal place of business is in Massachusetts. On information and belief, Liaison's development of ResidencyCAS occurred primarily in Massachusetts. In addition, on information and belief, Liaison's scheme to make unlawful statements about its ResidencyCAS product, to the detriment of Thalamus, were centered in Massachusetts and many of the false and misleading statements were made from Massachusetts. Additionally, many of the residency programs to which the statements were directed are located in Massachusetts, including Tufts Medical Center; Boston University Medical Center; UMass Chan – Baystate; UMass Chan Medical School; Beth Israel Deaconess Medical Center; Mass

44

General Brigham/Brigham & Women's Hospital/Massachusetts General Hospital; and Lahey Clinic.

167.    Thalamus has suffered damages proximately caused by defendants' conduct in an amount to be determined at trial. Thalamus has lost significant market share in the OBGYN space as a result of Liaison and Hammoud's scheme to corner the market on Liaison's behalf to the exclusion of Thalamus. In addition to lost market share, Thalamus has suffered a loss in goodwill and reputation.  Defendants' conduct was undertaken willfully and knowingly, thereby also entitling Thalamus to an award of up to treble damages and attorneys' fees.

168.    As a result of Defendants' unfair competition in violation of M.G.L. c. 93A, § 11, Thalamus has suffered and will suffer irreparable harm, in addition to monetary damages. Defendants' unfair competition has caused a loss of money or property entitling Thalamus to permanent injunctive relief.

### THIRD COUNT
### Breach of the MNDA
### (Against Liaison)

169.    Thalamus refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 168 inclusive.

170.    Liaison has and continues to owe confidentiality obligations to Thalamus under the MNDA.

171.    The MNDA is a valid contract supported by consideration, specifically, reciprocal promises to protect each other's confidential information in exchange for mutual information sharing rights.

172.    Thalamus has at all times performed under the MNDA.

173.    Thalamus provided confidential information about its offerings to Liaison under the MNDA including descriptions of all components of Thalamus's system.

174.    Liaison continues to be contractually obligated to maintain all Thalamus information under the MNDA in confidence and not to disclose any such information to any third party and not to use any such information, except with the express permission of Thalamus.

175.    Liaison has breached its contract with Thalamus by using information protected under the MNDA, without Thalamus's permission, to develop and market ResidencyCAS.

176.    Thalamus has experienced and continues to experience damage proximately caused by Liaison's contractual breaches, in an amount to be determined at trial.

177.    As a result of Liaison's breaches, Thalamus has suffered and will suffer irreparable harm in addition to monetary damages. Thalamus is entitled to preliminary and permanent injunctive relief.

**<u>FOURTH COUNT</u>**
**Tortious Interference with the Thalamus/AMA/APGO Agreement**
**(Against Liaison)**

178.    Thalamus refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 177 inclusive.

179.    On August 18, 2020, the AMA, APGO, and Thalamus entered into the Agreement.

180.    As set forth above, Section 4(d) of the Agreement places several restrictions on the AMA's and APGO's use of any information related to "Aggregate Pilot Data, the Service Offerings, or Thalamus's confidential and proprietary Restricted Information," including prohibiting any member of the AMA or APGO who had access to the Restricted Information from developing any product to compete with Thalamus's.

181.    APGO and the AMA have and continue to owe confidentiality obligations to Thalamus under the Agreement.

182.    The Agreement is a valid contract supported by consideration.

183.    Thalamus has at all times performed under the Agreement.

184.    Liaison knowingly induced the AMA and/or APGO to violate the Agreement, including by: (a) disclosing Thalamus's proprietary and confidential Restricted Information to Liaison, which information, upon information and belief, Liaison used in the development of ResidencyCAS; (b) knowingly permitting or facilitating the development of ResidencyCAS; and (c) using AMA and/or APGO personnel to contribute to the development of ResidencyCAS that had previously been given access to Thalamus's Restricted Information under the Agreement.

185.    Liaison's interference was intentional, used improper means, and Liaison had an improper motive when Liaison knowingly interfered with the AMA's and APGO's contractual confidentiality obligations to Thalamus. Liaison interfered with the Agreement to unlawfully obtain the benefit of Thalamus's confidential and proprietary Restricted Information.

186.    Thalamus has experienced and continues to experience damage proximately caused by Liaison's inducement of contractual breaches by the AMA and/or APGO, in an amount to be determined at trial.

187.    As a result of Liaison's inducement of the AMA and/or APGO's contractual breaches, Thalamus has suffered and will suffer irreparable harm in addition to monetary damages. Thalamus is entitled to permanent injunctive relief.

## FIFTH COUNT
### Tortious Interference with Advantageous Business Relationships with OBGYN Programs
### (Against Liaison and Hammoud)

188.    Thalamus refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 187 inclusive.

189.    An advantageous business relationship existed between Thalamus and well over a hundred OBGYN programs across the country. Of these, at least six were located in Massachusetts, namely: Tufts Medical Center; Boston University Medical Center; UMass Chan – Baystate; UMass Chan Medical School; Beth Israel Deaconess Medical Center; and Mass General Brigham/Brigham & Women's Hospital/Massachusetts General Hospital.

190.    After a pilot program in which OBGYN residency programs received free use of Thalamus, OBGYN residency programs were pleased and impressed with Thalamus's offerings for streamlining the residency application process. Thalamus became so popular among these programs that the pilot program was renewed for a second year, following which nearly all programs converted to full paying customers, paying over $3,000 per yearly subscription starting in 2022–2023. The same was true in 2023–2024 and Thalamus reasonably expected this advantageous business relationship to continue in 2024–2025 and well into the future.

47

191. Until the 2024-2025 residency season, the number of OBGYN programs using Thalamus continued to expand, representing the largest single specialty adoption of not only Thalamus, but any other residency interview scheduling system to date.

192. Hammoud and Liaison were aware of this relationship between Thalamus and the OBGYN programs and intentionally interfered with that relationship, using improper means and methods, such as false and misleading statements denigrating Thalamus as well as additional false and misleading statements in support of Liaison, with an improper purpose, as set forth above.

193. Upon information and belief, Liaison is engaged in revenue sharing with its GME partners and this is, at least in part, driving Hammoud's and these organizations' commitment to promoting Liaison's monopolization attempts within the GME space.

194. Liaison and Hammoud's interference was intentional and utilized (a) false smears regarding Thalamus's flexibility and willingness to cooperate with their supposed efforts to improve the residency process, (b) false statements promoting Liaison, and (c) false statements regarding adoption of ResidencyCAS within the specialty to improperly push Thalamus and others out of the OBGYN residency program space so that Liaison could monopolize the space for itself and its revenue-sharing partners.

195. Thalamus has experienced and continues to experience damage proximately caused by Liaison and Hammoud's interference with its business expectations regarding the OBGYN residency programs, in an amount to be determined at trial.

196. As a result of the defendants' interference with Thalamus's business expectations regarding the OBGYN residency programs, Thalamus has suffered and will suffer irreparable harm in addition to monetary damages. Thalamus is entitled to permanent injunctive relief.

### SIXTH COUNT
**Tortious Interference with Advantageous**
**Business Relationships with Emergency Medicine Programs**
**(Against Liaison and Hammoud)**

197. Thalamus refers to and incorporates herein by reference, as though fully set forth herein, Paragraphs 1 through 196 inclusive.

198.    An advantageous business relationship existed between Thalamus and well over a hundred emergency medicine programs across the country. Of these, at least six were located in Massachusetts, namely: Boston University Medical Center; Mass General Brigham/Massachusetts General Hospital/Brigham & Women's Hospital/Harvard Medical School; Beth Israel Deaconess Medical Center; Lahey Clinic; UMass Chan – Baystate; and the University of Massachusetts.

199.    Thalamus's offerings in application support and interview management were popular among the emergency medicine residency program community.

200.    Until the 2024–2025 season, the number of emergency medicine programs using Thalamus continued to expand.

201.    Defendants were aware of this relationship between Thalamus and the emergency medicine programs and intentionally interfered with that relationship using improper means and methods, such as false and misleading statements denigrating Thalamus as well as additional false and misleading statements in support of Liaison, for an improper motive.

202.    Upon information and belief, Liaison is engaged in revenue sharing and payments to its GME partners and this is, at least in part, driving Hammoud's and these organizations' commitment to promoting Liaison's monopolization attempts within the GME space.

203.    Thalamus has experienced and continues to experience damage proximately caused by defendants' interference with its business expectations regarding the emergency medicine residency programs, in an amount to be determined at trial.

204.    As a result of the defendants' interference with Thalamus's business expectations with regard to the emergency medicine residency programs, Thalamus has suffered and will suffer irreparable harm in addition to monetary damages. Thalamus is entitled to permanent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Thalamus respectfully prays for judgment against defendants and in Thalamus's favor as follows:

A.      For a permanent injunction enjoining Liaison and Hammoud from making false and misleading statements concerning ResidencyCAS;

B.      For a permanent injunction enjoining Liaison and Hammoud from attempting to block Thalamus from attending any conventions or meetings concerning the OBGYN market;

C.      For a permanent injunction enjoining Liaison from offering for sale any products developed in violation of the Agreement between APGO/AMA and Thalamus;

D.      For an award of all actual and compensatory damages in an amount to be proven at trial;

E.      For reasonable royalties, disgorgement of unjust enrichment, and restitution;

F.      For an award of attorneys' fees and costs of suit;

G.      For additional damages under the Lanham Act;

H.      For treble damages under G.L. c. 93A;

I.      For the imposition of a constructive trust and other equitable remedies as the Court deems just and proper;

J.      For pre-judgment and post-judgment interest as provided for by law; and

K.      For such other, further, and different relief as permitted by law and as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Thalamus demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

SJ MEDCONNECT, INC., dba THALAMUS

By its attorneys,


 /s/ Dhaivat H. Shah
Dhaivat H. Shah (*pro hac vice* motion
   to be filed*)*
David Siegel (*pro hac vice* motion
   to be filed*)*
Seth K. Kugler (*pro hac vice* motion
   to be filed)

GRELLAS SHAH LLP
550 California St., Suite 1040
San Francisco, CA  94104
Telephone: (408) 255-6310
Facsimile: (408) 255-6350


                         -- and --


 /s/ Michele E. Connolly

Peter E. Ball (BBO No. 546031)

Michele E. Connolly (BBO No. 680946)
FITCH LAW PARTNERS LLP
84 State St.
Boston, MA 02109
(617) 542-5542
peb@fitchlp.com
mec@fitchlp.com

Dated: July 26, 2026